Young Auto Parts, et al. [1] v. Commissioner. Young Auto Parts v. Commissioner
Docket Nos. 3779-66 - 3781-66.
United States Tax Court
T.C. Memo 1968-160; 1968 Tax Ct. Memo LEXIS 140; 27 T.C.M. (CCH) 778; T.C.M. (RIA) 68160; July 25, 1968. Filed Gregg M. Anderson, San Francisco, Calif., for the petitioners. Martin A. Schainbaum, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated proceedings respondent determined the following income tax deficiencies against petitioners: Fiscal Year Ended
Petitioner
Docket No.
Sept. 30
Deficiency
Young Auto Parts
3779-66
1962
$ 6,890.77
1963
7,921.31
1964
583.24
Young Auto Parts No. 1
3780-66
1962
4,999.07
1963
2,884.24
1964
2,085.04
Hilton Auto Parts
3781-66
1962
827.20
1963
298.06
1964
1,479.07
There are three issues for decision: (1) Whether the principal purpose for the formation of the three petitioner corporations was evasion or avoidance of Federal income tax within the purview of section 269, Internal Revenue Code of 1954, [2] so that the petitioners are not entitled to separate surtax exemptions; (2) whether deductions taken by two of the corporations for compensation paid to Joseph Pimentel, Jr., should be disallowed as unreasonable *142 and excessive; and (3) whether petitioner Young Auto Parts is entitled to a net operating loss carryback from the fiscal year ended September 30, 1964, to the fiscal year ended September 30, 1962. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Young Auto Parts (herein called YAP), Young Auto Parts No. 1 (herein called YAP No. 1), and Hilton Auto Parts (herein called Hilton) are California corporations which had their principal offices at 852 Main Street, Redwood City, California, at the time they filed their petitions in these proceedings. The three corporations will be referred to collectively as petitioners. Petitioners determined their taxable income on the fiscal year basis and used the accrual method of accounting. Petitioners filed their Federal corporation income tax returns for the fiscal years ended September 30, 1962, 1963, and 1964 with the district director of internal revenue, San Francisco, California. 779 Prior to October 1953, Joseph *143 Pimentel, Jr. (herein called Pimentel) and Earl Young were engaged in the business of selling automotive parts and accessories as a partnership doing business under the name of Young Auto Parts. Lloyd U. Porter, Jr. (herein called Porter) was an employee of the partnership of Pimentel and Young from approximately March 1948 through September 1953, at which time Porter acquired the partnership interest of Young with the financial assistance of Pimentel. A new partnership was formed as of October 1, 1953, with Pimentel and Porter as equal partners. Immediately after the formation of the Pimentel-Porter partnership, Porter became general manager of the only store of the partnership located at Redwood City, California, and was responsible for hiring and firing personnel, inventory control, purchasing, store arrangements, credit, and general operations of the store on a daily basis. In October 1957, the partnership opened a store in San Carlos, California, which was located approximately 4.5 miles from the Redwood City store. In May 1959, the partnership purchased a bankrupt Western Auto Supply Store in Mountain View, California, which was located approximately 10 miles from the Redwood *144 City store. In January 1961, the partnership purchased from Randolph Hilton an automotive parts store in Monterey, California, which is approximately 91 miles from Redwood City. This latter store is known as Hilton Auto Parts. YAP was incorporated on October 2, 1961. The assets and liabilities of the Redwood City store were transferred to it on that date. YAP No. 1 was incorporated on October 2, 1961. The assets and liabilities of the San Carlos and Mountain View stores were transferred to it on that date. Hilton was incorporated on October 2, 1961. The assets and liabilities of the Hilton Auto Parts store at Monterey were transferred to it on that date. The individual corporations have continued to operate the stores transferred to them since the date of incorporation. Such transfers were made pursuant to section 351 of the Code. Applications for permit to sell and issue its securities were filed by each petitioner with the Division of Corporations of the State of California. Permits were granted by the Division of Corporations for the issuance of stock and stock was issued pursuant to the permits. One-half of the stock was issued to Lloyd U. and Mary Lou Porter, and one-half *145 to E. S. Johnson, the maiden name of the wife of Joseph Pimentel, Jr. The majority of the petitioners' sales are of automotive parts at wholesale. They are generally sold to small businessmen operating service stations, small trucking and delivery firms, car dealers, independent repair shops, body shops, and industrial accounts. The physical locations of the stores range from San Carlos to Monterey, a distance of 96 miles. The stores basically follow the highway El Camino Real on the densely populated San Francisco peninsula. Each store has a separate physical location. Each store primarily sells the basic parts for automobile and truck engines, transmissions, differentials, and running gears as distinguished from accessory lines. In the automotive parts trade, these operations are commonly referred to as "hard parts" stores. Each store is operated by a store manager who is in direct charge of all operations. Each store manager purchases his inventory from an independent parts warehouse which is not related in any way to petitioners or their shareholders. The store manager signs each check in payment of goods or services rendered to the store. Each check is also signed by Porter. *146 Under the general supervision of Porter, the manager of each store is responsible for the complete day-to-day operations, including the establishment of hours during which the store will be open, supervising the employees both in and out of the store premises, hiring and firing of the employees of the store, supervising the machine shop operation, overseeing and directing the inventory control system, ordering mechandise, handling all customer complaints including making adjustments for parts or amounts due to the store, keeping up with the competition, maintaining sales volume, collecting accounts receivable, generating new business, approving purchases of merchandise and other obligations for payment, and adjusting every daily phase of the entire store operation. The store managers were required to meet once or twice a month for a sales meeting which was usually sponsored by a manufacturer's representative who would prepare and put on the presentation to introduce new items or parts in their line, their current sales program and basically to promote their own product. 780 Each store manager worked under a written employment contract. The contract provided that the manager *147 was to manage a particular store, that he would receive a stipulated monthly salary and a profit participation bonus of 10 percent of the current year's profits of his store in excess of 6 percent return on the moneys invested in the particular store. The inventory for each store had to be developed over a period of time through a very sophisticated inventory card index system consisting of from 30,000 to 70,000 cards, each representing a single part. Each store maintains its own inventory card system on the premises through the use of personnel hired by each store called "card girls." An inventory card is prepared for each part and the part number thereof recorded on the card. Other pertinent data relating to the part is also recorded. Various code numbers are utilized to designate the popularity of a particular part together with the designation as to where that part might be obtained if it was not in stock, i.e., a special order, an obsolete part, or one that could be obtained from the supplier's warehouse. The movement of the part from a particular store dictated the number of units that would be on the shelf or on order. The entries on the card indicated when the merchandise *148 was put into the inventory, dates of sales and the quantity sold, units on order and units on the shelf. Through the passage of time and maintenance of this card system the makeup of the inventory for any particular store location was developed. After a store had been in operation for a period of time, the nature and kind of people and businesses located in this marketing area would dictate the makeup of the specialized inventory for that store. The inventory for Hilton contained a great many items for foreign cars and Willys Jeep parts. Hilton did not have a complete stock of truck parts of any kind in its store. YAP No. 1 maintained a store at Mountain View where they have truck fleets of all categories, heavy, heavy industrial, light fleets, and medium priced passenger cars. The store at Mountain View was required to maintain an inventory for certain military pieces of equipment because of its close proximity to a military installation known as Moffet Field. In addition, the enlisted men stationed at Moffet Field also owned and were driving old vehicles, which required more parts for older automobiles than other areas. YAP No. 1 had a store in San Carlos which serviced only one *149 fleet of Mack trucks. San Carlos is a relatively high income area. Consequently, this store carried a greater inventory of parts for later model automobiles. The YAP at Redwood City has a few fleets and some industrial and medium priced automobiles among its customers. The inventory of one store if physically transported to another location would not meet the marketing requirements of a different area. Each day each store would develop an order for parts from the inventory control card. The order was written on a form supplied by the Colyear Motor Sales Company, a member of the National Automotive Parts Association, and referred to as the NAPA Warehouse. The NAPA Warehouse was located in San Francisco. The order was written by the personnel of each store for its own requirements. After the order had been prepared, it was then forwarded directly to the NAPA Warehouse, where it would be filled and delivered directly to the store originating the order. The bulk of the purchases of each store for the years under consideration and until September 1965 was purchased from the Colyear Motor Sales Company, NAPA Warehouse, and since September 1965 from the American Parts System Warehouse in *150 San Francisco. The form utilized for ordering parts by both NAPA Warehouse and American Parts System Warehouse is substantially the same. Each order was signed or initialed by a branch manager. Each store manager is required to approve the purchase of inventory for payment. The NAPA Warehouse would render its billing for the merchandise purchased to the individual store and petitioner which originated the order. At one time all merchandise was shipped to the various stores by common carrier. After a prolonged trucking strike, a decision was made to purchase a truck to deliver to those store locations which were within an economic distance from the NAPA Warehouse for purposes of insuring the steady and continuous flow of inventory to the various stores. The truck delivered merchandise to all locations during the years in issue, except the store at Monterey which was owned and operated by Hilton. All orders to the Hilton store were shipped via common carrier. The charges and cost of the truck and its operation were paid by each petitioner who used the truck based upon the dollar sales volume of each 781 petitioner to the total sales volume of all petitioners who used the truck. *151 Each store handles the sale to any customer originating at its store. If merchandise is delivered from another store because the originating store is out of the particular item, the originating store makes the sale, collects for it and purchases the item from the store making delivery. Sales are made by each separate store and it issues its own invoice to the customer for the sale. The personnel of each store independently handle their own customers. A separate sales invoice is written on every sale whether it is cash or charge. Whenever a customer enters a store and requests a part which is not in inventory the procedure to obtain that part for a customer varies slightly depending upon the amount of time the customer will wait for the part. If a customer can wait long enough, the part will be purchased from the NAPA Warehouse directly by the store. In the event the customer requires the part immediately, the part will be purchased locally from a competitor, if it is available, and sold to the customer at the price paid to the competitor. If there is enough time available, an attempt will be made to obtain the requested part from one of the other stores related to the petitioners *152 herein. All transfers from one store to another store are made with a 5 percent charge for handling. If time permits, attempts will be made to acquire the parts from a related store because the acquiring store will be able to purchase the part at a lower price than from a direct competitor. The manager of each store is required to collect for all his sales. The accounts receivable collections and cash sales proceeds are deposited daily to a local branch of the Bank of America in a separate account of each petitioner as the case may be. Each store manager has the authority to approve and disapprove customer credit within his territory, subject to Porter's review. Each store has a machine shop. These machine shops are leased out to a machinist who owns, operates, and maintains his own equipment and establishes his own prices for his work. Each machinist has his own employees and pays them directly and is responsible for their activities. The machinist supervises the work of his employees. The machinist is an independent operator and contractor, not an employee of the particular petitioner which enters into a lease at any one of its store locations. The work performed by the machinist *153 is billed by the particular store and collection is made by the store on behalf of the machinist. The machinist pays a percent of the total work performed for the services of the store and for the physical space utilized by the machinist. The machine shop operation plays an important role in the business operations of a hard parts store. Machine shop work is essential in the motor rebuilding business. The work to be performed by the machinist is written by the employee of the store at the parts counter. The invoice used is a two-part form called a "shop order," and lists not only the parts to be used but also the work to be performed by the machinist. The shop order is written for every job. The back or hard part goes to the machinist together with the parts so that he can perform his work. The face of the invoice is retained at the counter and after the work has been performed the hard copy is compared with the front copy and the billing completed. Billing is then made on a regular store invoice. No portion of the shop order goes to the customer. The customer is not advised that the machinist is an independent contractor. All collections on behalf of the machinist are made by the *154 particular store. The machinist establishes his own rates for his work. Petitioners purchased blanket insurance policies which cover the same risks of each of the petitioners at each of their locations. Upon the advice of their insurance broker, broader coverage was obtained at a lower cost per unit by combining all the stores of the petitioners under a single blanket policy. Petitioners carried a group medical policy covering all of the employees in the various corporations. The coverage was under a single policy for all the petitioners. The carrier and the coverage were selected by the participating employees. The premium cost for each employee was charged to the store which employed the insured party. Whenever a blanket insurance policy or group insurance coverage existed, the actual amount of premium cost incurred by each petitioner was billed to and paid by a separate check of each petitioner to the insurance carrier or its representative. The insurance carrier would provide the premium breakdown which applied to each of the petitioners. The group medical charges were determined by the general accounting office based on the location where each covered employee worked. Separate *155 company checks were then written to pay the insurance premium cost. 782 During the years in issue not all stores were operated under the same name. The store at Monterey owned by Hilton was operated under the name Hilton Auto Parts; the stores owned by YAP No. 1 were operated under different names, i.e., the store at Mountain View was known as Young Western Auto Parts, the store at Santa Clara, operated under the name University Auto Parts, and the store at San Carlos operated under the name Young Auto Parts; the two stores owned by YAP and located at Menlo Park and Redwood City were operated under the name Young Auto Parts; the store owned by San Bruno Auto Parts and located at San Bruno operated under the name San Bruno Auto Parts; and the stores owned by Advanced Auto Supply Company and located in San Jose operated under the name Advanced Auto Supply Company. Each time a store was acquired at a different location an attempt was made to continue to use the name that existed on that store as a going operation prior to the time of acquisition by any of the petitioners. Names were only changed when it was necessary to do so for legal reasons. Porter and Pimentel purchased *156 in equal amounts all the stock of San Bruno Auto Parts in 1962 and all the stock of the Advanced Auto Supply Company in 1964. After the stock purchases, the two corporations which owned and operated the store at San Bruno and the two stores of Advanced Auto Supply in San Jose were owned in the same proportions as petitioners and had identical boards of directors and officers. The procedures for purchasing of merchandise, payment of the bills, insurance coverage, accounting for their operations, management and all of their business activities were handled in the same manner and by the same general accounting office. Mary Lou Porter has been employed by the petitioners in the general accounting office as office manager since their inception in October 1961. Prior to that time she was also in charge of the accounting for the partnership. Mary Lou Porter supervised the office staff which handled the bookkeeping, accounts receivable, recapping of each day's business, maintaining corporate files, correspondence and all of the detailed procedures involved in operating the general accounting office. The general accounting office was located at 852 Main Street, Redwood City, California, in *157 a separate building behind the main store. The general accounting office would accumulate the purchases by suppliers, and the charges for services billed to each petitioner during the month, prepare checks for payment and return them to the store manager for signature. The checks were countersigned by Porter. Suppliers would bill each petitioner separately for merchandise supplied to one of its stores and payment for that merchandise would be made by the petitioner from its own bank account. On occasion, merchandise would be purchased by a related store for sale to a customer. The merchandise would be billed to the store requiring the item and an invoice prepared from the shipping store to the receiving store. The merchandise would be invoiced at cost plus 5 percent, which price is designed to cover freight and handling of the merchandise by the selling store. At the end of each month checks are prepared to settle sales between stores. A separate invoice by each store making a sale to a customer is prepared at the time of making the sale and at the end of each day the charge and cash sales are accumulated and recorded on a daily cash report form. The form has a further breakdown *158 for nontaxable sales, taxable sales, sales tax, and labor. The daily cash report supports each day's sales and collection activities for each store, and it is forwarded to the general accounting office where the posting to the individual customer's account is completed. The daily cash report further substantiates the amount and makeup of the bank deposit for each store for each day. Each petitioner maintains its bank account at Branch 32 of the Bank of America in Redwood City. Each of these accounts are the ones on which the checks of each petitioner are drawn in payment of its merchandise purchases or other obligations. Each petitioner has its own separate bank account number and checks. The checks of each petitioner are of different colors to aid in the mechanical maintenance of separateness. Each branch store would daily deposit its receipts from cash sales and collections on account in a branch banking office of the Bank of America which was located nearest to the physical location of each store. These accounts were opened in the name of the petitioner which owned that store and funds collected by that store would only be deposited in that local branch to the credit of 783 *159 that petitioner. The Bank of America would then forward these funds from the local branches to the branch located at Redwood City to the credit of each petitioner. The collections of Young Western Auto Parts at Mountain View and Young Auto Parts at San Carlos would be deposited in the local branch to the account of YAP No. 1 and the local branch would then forward these deposits to the Redwood City office of the Bank of America, and they in turn would be deposited to the account of YAP No. 1. The same procedure would be followed by Hilton at the Monterey store. On occasion, the Redwood City branch of the Bank of America would make deposits in the incorrect account or approve the payment of a check from an improper account. These errors would be caught by the bank, the general accounting office or the auditor, and the bank would be notified and the bank errors corrected. The employees of each petitioner were paid with checks prepared at the general accounting office and drawn on the bank account of each petitioner to pay salaries and wages of the specific employee performing services for that petitioner. Separate payroll tax returns were prepared for each petitioner and filed. Each *160 petitioner has its separate employer tax identification number. The employees who worked in the general accounting office and the driver of the delivery truck were paid by YAP. The charges for these salaries were then made monthly by YAP to YAP No. 1, Hilton, San Bruno Auto Parts, and Advanced Auto Supply Company for their proportionate part of the cost incurred. All three petitioners shared in the cost of the general accounting office personnel and YAP and YAP No. 1 shared in the cost of the truck and its driver. The costs were charged pursuant to a formula which was the gross sales of a particular store over the total gross sales of all stores times the amount of the expense. Each petitioner was billed directly by the creditor for expenses incurred by it where such expense was directly incurred or identifiable. These expenses were paid by a separate check drawn on the account of the petitioner incurring such expense. Some of these items were rental costs of the premises, insurance premiums, and accounting fees. The records of each corporation are maintained in physically separate containers at the general accounting office in Redwood City. While Young Auto Parts partnership *161 was in existence, any transactions between stores were made on the books by a simple journal entry. After the petitioners incorporated and began operating the businesses, all transactions were handled in the same manner as they would have been handled with unrelated parties. Each petitioner issued its check to the other petitioner for services of [or] merchandise used or acquired. Separate books and records were established and maintained for each of the petitioners. Separate audited financial statements for each petitioner were prepared on an annual basis by an independent certified public accountant. All financial statements prepared were for the individual petitioners and were never prepared on a consolidated basis, i.e., combining all stores and all operations. The operation of an auto parts store is one that is exposed to substantial economic risks. The customers of petitioners are for the most part financially unstable. Service station operators, car dealers, independent repair shops, body shops, fleet accounts, and industrial accounts constitute the great bulk of the customers of petitioners. The rate of failures in this group is high. The investment in inventories and *162 accounts receivables is heavy in relation to sales volume. Approximately 85 percent of the business is conducted on a charge basis. The business is extremely competitive. Petitioners were subjected to other liability hazards for product liability and numbers of delivery trucks operating on the streets and highways. Each store, except for the new one in San Carlos, was in financial difficulty at the time it was purchased. Labor problems at the various locations were paramount in the minds of the incorporators. Labor union problems were in evidence at the Santa Clara and Mountain View operations of YAP No. 1. The accountants of the partnership advised Pimentel and Porter that to incorporate would protect their respective financial interests and fortunes. Porter had all his fortune in the business and he wanted to be able to develop the ability to sell stock to employees or outsiders in small or single store units. Neither the Porters nor the Pimentels had any children. The accountants discussed tax advantages and disadvantages which would result by using more than one corporation in the event any single corporation incurred a loss. 784 The sale of stock to employees *163 was discussed at the time of incorporating so as to make it possible to sell small units rather than large units in the event of death of Pimentel or Porter. Pimentel's wife urged him to incorporate to protect her position in the event of his death. The shareholders of petitioners had been advised by their accountant and their attorney to create four corporations but, after consultation between the shareholders, a decision was made to reduce incorporating costs and create three corporations instead of four. A summary of the Young Auto Parts partnership and Petitioners' taxable income and earned surplus, as reflected on Federal income tax returns for the fiscal years ended September 30, is as follows: YOUNG AUTO PARTS (PARTNERSHIP)
1961
GROSS RECEIPTS
$ 743,766.79
Less: Cost of Goods Sold 469,282.10
Gross Profit
274,484.69
Miscellaneous Other Income 11,047.14
285,531.83
Deductions
221,341.20
Taxable Income 64,190.63
YOUNG AUTO PARTS
1962
1963
1964
GROSS RECEIPTS $ 335,022.66
$ 333,535.73
$ 366,021.28
Less: Cost of Sales 208,877.77
211,216.83
242,662.67
Gross Profit 126,144.89
122,318.90
123,358.61
Capital Gain (Sec. 1231 Assets)
2,100.00
Miscellaneous Other Income 7,428.32
8,888.47
9,273.03
Total Income
$ 133,573.21
$ 131,207.37
$ 134,731.64
DEDUCTIONS 126,353.07
112,293.22
135,831.68
Taxable Income (Loss) $ 7,220.14
$ 18,914.15
($ 1,100.04)
EARNED SURPLUS BEGINNING YEAR
$ 5,054.10
$ 18,294.00
Taxable Income 7,220.14
18,914.15
(1,100.04)
Total
$ 7,220.14
$ 23,968.25
$ 17,193.96
Less: Federal Income Tax 2,166.04
5,674.25
Earned Surplus End of Year $ 5,054.10
$ 18,294.00
$ 17,193.96
*164 YOUNG AUTO PARTS No. 1
1962
1963
1964
GROSS RECEIPTS
$ 481,021.12
$ 525,201.09
$ 505,244.21
Less: Cost of Sales 317,447.91
339,364.11
316,677.74
Gross Profit
163,573.21
185,836.98
188,566.47
Capital Gain (Sec. 1231 Assets)
Miscellaneous Other Income 5,711.62
6,907.79
6,667.33
Total Income
$ 169,284.83
$ 192,744.77
$ 195,233.80
DEDUCTIONS 143,964.52
184,725.50
183,801.35
Taxable Income (Loss) $ 25,320.31
$ 8,019.27
$ 11,432.45
EARNED SURPLUS BEGINNING YEAR
$ 17,653.75
$ 23,267.24
Taxable Income 25,320.31
8,019.27
11,432.45
Total
$ 25,320.31
$ 25,673.02
$ 34,699.69
Less: Federal Income Tax 7,666.56
2,405.78
2,745.04
Earned Surplus End of Year $ 17,653.75
$ 23,267.24
$ 31,954.65
HILTON AUTO PARTS
1962
1963
1964
GROSS RECEIPTS
$183,663.91
$186,453.07
$179,049.62
Less: Cost of Sales
117,436.70
115,739.62
107,172.54
Gross Profit
66,227.21
70,713.45
71,877.08
Capital Gain (Sec. 1231 Assets)
Miscellaneous Other Income 2,630.94
2,437.93
2,482.66
Total Income
$ 68,858.15
$ 73,151.38
$ 74,359.74
DEDUCTIONS 62,598.14
69,296.57
66,276.47
Taxable Income (Loss) $ 6,260.01
$ 3,854.81
$ 8,083.27
EARNED SURPLUS BEGINNING YEAR
4,382.01
7,080.38
Taxable Income 6,260.01
3,854.81
8,083.27
Total
$ 6,260.01
$ 8,236.82
$ 15,163.65
Less: Federal Income Tax 1,878.00
1,156.44
1,940.87
Earned Surplus End of Year $ 4,382.01
$ 7,080.38
*165 No dividends have ever been declared or paid by any of the petitioners since their incorporation. Pimentel was initially an equal partner with Earl Young in the Young Auto Parts partnership. Pimentel and Young severed their partnership relationship and Porter purchased the 50 percent interest of Young. Porter was then working for the partnership and was relatively inexperienced at that time. Although Porter and Pimentel were equal partners in the Young Auto Parts partnership from October 1, 1953, until October 2, 1961, when the partnership store operations were transferred to petitioners herein, the ownership interest of Pimentel in the partnership was undisclosed to the trade and partnership employees. Pimentel, being district manager of Colyear Motor Sales, a wholesale distributor of automotive parts and accessories, did not wish his activities in the retail sale of automotive parts revealed. Porter, as the active partner in the partnership, managed its day-to-day operations. During the years herein involved Porter continued to act as general manager of petitioners' daily operations. Except for himself, Mary Lou Porter and Eugene Porter, none of petitioners' employees had knowledge *166 of Pimentel's interest in petitioners. Pimentel has been engaged in the auto parts business since 1923. His activities range from inside and outside sales work to district manager of a National Auto Parts Association warehouse employing approximately 120 employees. Pimentel terminated his employment with Colyear Motor Sales in February 1965, and went to work for a large national corporation to establish a parts warehouse in Northern California under the name of American Parts System.
From his earliest business employment Pimentel has engaged in additional businesses outside of his regular employment. During the year 1923 he established two service stations in Fresno, California. In 1927 another service station was built. These businesses were sold during the years 1926 and 1927 and C.C. Colyear employed Pimentel in October 1927 to operate an auto parts store in Fresno. In 1930 Pimentel was transferred to San Francisco to take charge of the Colyear Motor Sales operation in San Francisco, Oakland, and Sacramento. For the 4 years between 1936 and 1940 Pimentel returned to Fresno to manage a store there but again returned to San Francisco to take charge of Colyear Motor Sales operations *167 in San Francisco in 1940. Pimentel remained in San Francisco as district manager for the Colyear Company from 1940 until he terminated his employment with them in 1965. Colyear Motor Sales had two separate types of businesses, one was the NAPA Warehouse which sold to jobbers and the other was parts stores which catered to car dealers and service stations. Colyear Motor Sales was a member of the National Auto Parts Association, which is a national association having a board of directors and was formed about 1925 for the purpose of combining several manufacturers together to supply auto parts to jobbers. The membership of National Auto Parts Association (NAPA) was at one time composed mostly of members who owned their own warehouses. As district manager of Colyear Motor Sales, Pimentel was in charge of all operations and would oversee all departments: shipping, receiving, purchasing, sales, warehousing, and administrative. From 1961 until the termination of his employment, Pimentel was the permanent chairman of the Advisory Committee to the president and board of directors. Internal fighting for control, coupled with negotiations for the sale of the Colyear Motor Sales Company, caused *168 the shareholders to split into two different management factions. After a substantial amount of maneuvering by the shareholders for management control, Pimentel terminated his association with Colyear Motor Sales. As a result of his responsible position with Colyear, Pimentel worked about 60 hours a week and was paid a cash salary and bonus by Colyear Motor Sales of $43,287.87 for the year 1962 and $41,370.39 for the year 1963. He also received $39about,000 from the Colyear retirement plan upon the termination of his employment with the company.
On July 15, 1965, Pimentel accepted employment with Gulf Western Company. A decision was made by Pimentel and Porter, as directors and officers of petitioners, to switch the purchases of the petitioners from the NAPA Warehouse to American Parts System Warehouse. This decision was accelerated by reason of a strike at the NAPA Warehouse. Pimentel had specialized training in management and knew all phases of the operation of the auto parts business. He was adept at reading and analyzing financial reports. He was known as "Mr. Parts Business." The general accounting office prepared records which were forwarded to Pimentel for his review and analysis. *169 Some of the records prepared were details of the accounts receivable for each of the petitioners broken down into an aging schedule of 30, 60, 90 days and prior to 90 days, detail breakdown of payments by check by store and the item for which that check was written, breakdown of sales by store into their various parts elements, amount of payroll in detail by store, a 5-day progress report comparing actual sales with projected sales, monthly recap detailing machine shop operations, the detail of sales from one store to another, and other reports relating to all phases of the business operations. Pimentel engaged in the management decisions of petitioners. Some of the services rendered consisted of analyzing financial data, developing increased business, controlling the cash flow, assisting in collections of accounts receivable, aiding in the purchasing, checking salesmen territories, ferreting out potential new customers, purchasing additional store locations, analyzing the stores offered to any petitioner for purchase, leasing machine shops, leasing store locations, negotiating labor contracts, purchasing capital items and, in general, participating in many of the top level management *170 decisions that were required in the operation of the businesses. Pimentel prepared and caused to be mimeographed, addressed and mailed to the customers of petitioners a system of advertising letters, consisting of a series of six to eight letters, about every two weeks. There were no charges to any of the petitioners for such services.
In addition to his own review of the various accounting and financial reports submitted to him, Pimentel would spend some time every other Saturday with Porter at Redwood City or at other locations on the San Francisco Peninsula. He spent part of every other Sunday with Porter or working on petitioners' problems. He also worked occasionally on petitioners' business in the evenings and he was available for telephone consultations at all times. The consultations were frequent. On the average Pimentel spent approximately 10 hours per week performing services for the petitioners.
The prevailing rate for management consultants in the area in which petitioners operate is approximately $25 per hour. Bonuses for officers were authorized by meetings of the board of directors and the actions were reduced to formal minutes.
The following is a schedule showing *171 the amounts of compensation paid to Porter, Pimentel, and Mary Lou Porter during the years 1962 through 1964: Lloyd Porter, President
1962
1963
1964
Young Auto Parts
$ 16,150
$ 7,840
$ 6,200
Young Auto Parts No. 1
1,250
10,060
7,800
Hilton Auto Parts 600
600
0
Totals
$ 18,000
$ 18,500
$ 14,000
Joseph Pimentel, Secretary
1962
1963
1964
Young Auto Parts
$12,735.25
$10,404.25
$ 6,189.14
Young Auto Parts No. 1
5,382.83
8,500.00
6,000.00
Hilton Auto Parts 0
0
0
Totals
$18,118.08
$18,904.25
$12,189.14
Mary Lou Porter, Treasurer
1962
1963
1964
Young Auto Parts
$ 2,903.50
0
$ 2,388.50
Young Auto Parts No. 1
3,460.17
$ 2,010.50
2,238.00
Hilton Auto Parts 1,150.00
1,261.50
1,373.50
Totals
$ 7,513.67
$ 3,272.00
$ 6,000.00
Ultimate Findings 1. Petitioner corporations were formed for bona fide business purposes and engaged in substantial business activities. The principal purpose of incorporating was not evasion or avoidance of Federal income tax. Petitioners did not operate a single integrated business, but each corporation was a separate and distinct business. *172 2. The compensation paid to Pimentel by YAP and YAP No. 1 in the fiscal year ended September 30, 1964, was for services actually rendered and was reasonable. For the fiscal years ended September 30, 1962, and 1963 reasonable compensation [3] for the services rendered by Pimentel was as follows: Petitioner
1962
1963
YAP
$9,500
$7,500
YAP No. 1
3,000
5,000
Opinion 1. Surtax Exemptions. Respondent contends that the three petitioner corporations were formed, and control was obtained by their stockholders, for the principal purpose of evasion and avoidance of Federal income tax by securing the benefit of additional surtax exemptions under section 11(d). It is argued that the three corporations were part of a single integrated business enterprise and that one surtax exemption of $25,000 is allowable among them under section 269[4] and should be apportioned $7,500 788 to YAP, $15,000 to YAP *173 No. 1, and $2,500 to Hilton. Petitioners contend that bona fide business considerations, rather than tax avoidance, prompted their formation. Thus, narrowly framed, the first issue is whether the petitioners have established by a preponderance of the evidence that a tax avoidance purpose did not exceed in importance any other purpose. Section 1.269-3, Income Tax Regs., Commodores Point Terminal Corporation 11 T.C. 411 (1948); and Hawaiian Trust Company v. United States, 178 F. 2d 637 (D.C. Hawaii, 1959). This is a question of fact to be determined upon consideration of the entire record. Commissioner v. Chelsea Products, Inc., 197 F. 2d 620 (C.A. 3, 1952), affirming 16 T.C. 840 (1951); and Bush Hog Mannfacturing Co., 42 T.C. 713 (1964). We agree with petitioners. Our ultimate findings of fact are dispositive of the issue. *174 The incorporators of the petitioners herein began business operations as a partnership in October 1953 with the operation of one store in Redwood City. Pimentel, by reason of his position with Colyear Motor Sales, knew of bankruptcies, creditors' arrangements, and forced sales of stores in the "hard parts" retail business. Later the partnership acquired two additional stores which were financially distressed, and a fourth store was established in San Carlos. The "hard parts" business has certain intrinsic properties which suggest incorporation. Most of its sales are on credit to one of the largest class of business insolvents of our economy, i.e., small garages and service stations. Complete inventories must be stocked at the point of sale and the investment in inventory alone is substantial. Every geographic location requires a different inventory due to the differences in commercial vehicles as well as passenger automobiles which are found in that area, thereby making the initial period during which the inventory is established quite costly. Each store must have its own machine shop which, apart from the usual complication one would expect from operating a business within a business, *175 creates a potential tort liability. The incorporators, during the period of their partnership operations, encountered other equally compelling economic problems. Unions were pressuring two of their four stores, and their principal supplier was beset with a strike. They had formulated a plan to eventually own 15 stores and had been advised by their accountant that such a large enterprise would be totally unmanageable as a partnership, as evidenced by the current difficulties with only four stores. The slim profit margin required a large volume and, since this industry is acutely competitive, each store was forced by the very nature of the business to be an independent unit, controlled closely by its manager. It was apparent that eventually an equity position should be afforded those managers who produced well, since the retention of such employees would provide the continuity required for the recovery of the partners' time and investment in the operations. Both partners were childless, available management to replace either partner was lacking, and business continuity presented a serious problem in the event of death or disability. Cf. Larrabee v. United States, (D.C.Cal. 1968). *176 In light of these facts, it is not at all surprising that the partners were advised to incorporate. Petitioners were founded in October 1961. For reasons of economy only three corporations grew from the four partnership locations. All legal and normal corporate acts, records, bank accounts, and minutes were immediately taken and established. Federal employer identification numbers and California sales tax permits were obtained. All required tax returns were prepared, filed and the taxes due were paid. Financial statements, dealings and contracts with employees, customers, creditors, labor groups, and governmental authorities were separately originated and established. As this Court has said in prior cases, following Higgins v. Smith, 308 U.S. 473 (1940); and Gregory v. Helvering, 293 U.S. 465 (1935), it is axiomatic that a taxpayer may adopt such form for the conduct of his business as he may desire in order to minimize the incidence of taxation, so long as the form is not a sham and business is actually carried on. In Aldon Homes, Inc., 33 T.C. 582, 596-597 (1959), we stated: The above cases make it clear that *177 a taxpayer may adopt any form he desires for the conduct of his business and that form cannot be ignored merely because it results in a tax saving. However, to be afforded recognition the form the taxpayer chooses must be a viable business 789 entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity. Moline Properties, Inc. v. Commissioner, 319 U.S. 436; Jackson v. Commissioner, (C.A. 2, 1956) 233 F. 2d 289. Escaping taxation is not a substantive business activity. National Carbide Corp. v. Commissioner, 336 U.S. 422, footnote 20, citing National Investors Corp. v. Hoey, supra. Respondent acknowledges in his reply brief that he does not seek to ignore petitioners and tax their income to the shareholders, but simply takes the position that the three corporations are entitled to only one surtax exemption. The facts herein clearly show that the primary intent of petitioners' shareholders in creating the three corporations was the limitation of liability in a hazardous business and for other reasons connected with *178 their plans for the growth of business operations and their personal estate planning. Cf. Turner-Moore No. 22 v. United States, 6 A.F.T.R. 2d 5561 (W.D. Tex., 1960); and Tidewater Hulls, Inc. v. United States, 21 A.F. t.r./ 2d 1444 (E. D. La., 1968). No evidence was offered by respondent to indicate that the purposes and intentions of the incorporators were other than those established by them. And the evidence is uncontroverted that each petitioner functioned independently and had substantial corporate business existence. In many cases in which the courts have considered the application of section 269 to various factual situations, the evidence has disclosed that the principals had some awareness of tax benefits and quite often an intention to take advantage of such benefits. The courts have acknowledged the existence of this factor but have consistently pointed out that it alone is not sufficient to justify invoking the provisions of section 269. See Sno-Frost, Inc., 31 T.C. 1058, 1062 (1959); Alcorn Wholesale Co., 16 T.C. 75-89 (1951); and Berland's Inc. of South Bend, 16 T.C. 182 (1951). As the incorporators were advised *179 by counsel at the time the corporations were formed, the opportunity for tax disadvantage was as proximate as the opportunity for tax advantage. As the testimony shows, the petitioners did suffer tax disadvantages because of the inability to offset losses. This aspect of business entity planning has been considered by the courts. Cf. Bush Hog Manufacturing Co., supra; and v. h. Monette & Co., 45 T.C. 15 (1965), affirmed on another issue, 374 F. 2d 116 (C.A. 4, 1967). In connection with the consideration of tax disadvantages, we note that while respondent asserts that petitioners, all commonly owned and managed, were operated as a single integrated business enterprise, he has not involved in this litigation two other corporations, which are engaged in the same type of business and are owned and operated by petitioners' shareholders. Both of these corporations were acquired by the purchase of their stock by Porter and Pimentel, the first in San Bruno in 1962 and the second in San Jose in 1964. It appears that respondent has neatly pruned from the corporate tree those limbs which are inconsistent with his position herein, thus depriving us of *180 the complete factual picture. We think it was necessary to the survival of each store that it be operated as an independent unit. The unique properties of the "hard parts" business demanded an in-depth analysis and management control of each store, its inventory, credit, and hours of operation. The large investment in inventory, coupled with a slim profit margin and a substantial ratio of accounts receivable to total current assets, meant that any attempt to treat the stores on any basis other than singularly could have resulted in financial difficulties rather quickly. Petitioners' shareholders had plans for expansion and did expand, acquiring two corporations by the purchase of their stock during the years before us, although those corporations were not attacked by respondent. At all times the petitioners separately transacted their normal legal and corporate business in their own names. Each petitioner had separate records for contracts, correspondence, accounting and bookkeeping functions. The numerous details of corporate existence with local, State and Federal authorities were separately transacted and at no time were the petitioners joined for convenience or advantage and *181 held out to be a single business. Petitioners' shareholders had always attempted to retain the name of their predecessors in interest and, consequently, no attempt was made to capitalize on the "Young Auto" name as new locations were acquired. This record fails to show that the petitioners fall into the classic grouping of corporations held to be operated under the 790 "single business entity" theory, as suggested by respondent. The uncontroverted testimony and evidence introduced at the trial establish that the individual identity of each petitioner was carefully maintained. The stipulated facts indicate the substantial distances in terms of geographic location between petitioners, as much as 96 miles. Each petitioner has its own employees, its own bank account, its own books and records, contracts for its own outside services independently through its employees, and compensates its manager based on each individual store performance which is not tied in any manner to related corporations or to a related store. Each petitioner is confronted with different problems with respect to inventory control and credit. The success of each operation depended largely upon the ability *182 of its manager to tailor its inventory to the needs of the immediate geographic area. Each store served a different marketing area. It is also significant that the petitioners did not hold themselves out to their creditors as being one single integrated business. The accountant for the corporations testified that he had never prepared a consolidated financial statement for them. Obviously, if the joint assets were to be used for borrowing purposes, a consolidated financial statement would have been required by the lender. It is true that the petitioners shared certain common facilities through the use of a centralized accounting office which performed bookkeeping functions for all three corporations. However, this function was very similar in operation to a bookkeeping service, such as one might find selling services to the general public. Certainly the fact that two corporations have the same bookkeeper does not mean that they are operated as a single integrated business. The evidence and testimony show that even though the bookkeeping was done in a common physical structure, all of the physical records of the corporations were kept separate and distinct. On this record we are *183 satisfied that the petitioner corporations would have been created absent of any tax advantage. Therefore, we conclude that petitioners were not formed for the principal purpose of evasion or avoidance of Federal income tax within the purview of section 269. 2. Reasonableness of Pimentel's Compensation. Petitioners YAP and YAP No. 1 claim that the amounts paid as compensation to Pimentel in the fiscal years ended September 30, 1962, 1963, and 1964 were for services actually rendered and were reasonable. To the contrary, respondent has determined, and now argues, that the services rendered by Pimentel were of no value. He urges that we disallow all of the compensation as unreasonable and treat the payments as dividends. We do not agree entirely with either position. Section 162(a) (1) provides that "a reasonable allowance for salaries or other compensation for personal services actually rendered" is deductible as a business expense. Section 1.162-7, Income Tax Regs., provides that "in any event the allowance for the compensation paid may not exceed what is reasonable *184 under all the circumstances." Whether compensation is reasonable in amount is basically a question of fact to be determined by the particular circumstances present in each case. Joe (Joseph) Dillier, 41 T.C. 762 (1964), affd. sub. nom. Made Rite Investment Co., 357 F. 2d 647 (C.A. 9, 1966); Langley Park Apartments, Sec. C, Inc., 44 T.C. 474 (1965), affirmed percuriam curiam 359 F. 2d 427 (C.A. 4, 1966); Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. The burden of proof as to reasonableness is on the petitioners. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Ben Perlmutter, 44 T.C. 382 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967). Although respondent's determination is presumed to be correct, once the petitioners have shown by competent evidence that respondent's determination is erroneous, the presumption of correctness loses its force and the Court must then determine from all the available *185 evidence what was reasonable compensation for the services rendered. Each case in this area is sui generis and it would serve no useful purpose to review the various criteria which are operative in arriving at a determination on the basis of the particular facts involved. Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949): Suffice it to say that we have given consideration to all 791 pertinent factors in making our ultimate findings of fact. Our evaluation has involved close scrutiny because we are dealing with closely-held corporations. See Seven Canal Place Corporation v. Commissioner, 332 F. 2d 899 (C.A. 2, 1964). In these cases, like most reasonable compensation cases, there are disparate elements in the mix. Among these we have given particular consideration to: (1) The knowledge, experience, and skills of Pimentel; (2) the nature and scope of the managerial and consultation services he performed for petitioners; (3) the amount of time (10 hours per week) Pimentel devoted to performing services for the corporation; (4) the size and complexity of petitioners' operations; (5) a comparison between the amounts paid to Pimentel and the *186 petitioners' sales, income, profits, invested capital and dividends; (6) the prevailing economic conditions of the businesses; (7) the fact that the corporations never paid dividends; (8) the fact that Pimentel by his review of petitioners' activities was protecting the stock investment of his wife; and (9) the expert testimony of Paul Dunmire, a management consultant. Based on all the evidence presented and taking into consideration all pertinent factors, we have found that reasonable compensation for services rendered was paid to Pimentel by YAP and YAP No. 1 for the fiscal year ended September 30, 1964, and that the amounts of reasonable compensation for the other two fiscal years (1962 and 1963) are as set out in our ultimate findings. Such amounts are properly deductible by the two corporations. 3. Net Operating Loss. Since we have held that the compensation of $6,189.14 paid to Pimentel by YAP in the fiscal year ended September 30, 1964, was reasonable and for services rendered, it follows that the amount of the net operating loss of YAP for that year is $1,100.04. Such amount can be carried back to the fiscal year ended September 30, 1962. To reflect the conclusions reached *187 herein, Decisions will be entered in all dockets under Rule 50. Footnotes
1. Consolidated herewith are: Young Auto Parts No. 1, Docket No. 3780-66; and Hilton Auto Parts, Docket No. 3781-66.↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. Reasonable compensation has been determined from the evidence by allowing Pimental to be paid at the rate of $25 per hour, 10 hours per week, for 50 weeks in the year, or total compensation from both corporations of $12,500 in each of the years 1962 and 1963.↩
4. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. (b) Power of Secretary or His Delegate to Allow Deduction, Etc., in Part. - In any case to which subsection (a) applies the Secretary or his delegate is authorized - (1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or (2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or (3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).↩